IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| THOMAS KELLY, | : | Case No. 1:17-cv-320 |
| Plaintiffs, | : | Judge Susan J. Dlott |
| v. | : | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| ACCOUNT CONTROL TECHNOLOGY, INC., | : | |
| Defendant. | : | |

This matter is before the Court on Defendant's Motion for Summary Judgment (Doc. 15). Plaintiff opposes the motion (Doc. 16), and Defendant replied (Doc. 17). For the reasons that follow, the Defendant's Motion will be **GRANTED** in part and **DENIED** in part.

## I. BACKGROUND

### A. Facts

Defendant Account Control Technology ("ACT") operates a debt collection call center located in Mason, Ohio. (Defendant's Proposed Undisputed Facts, Doc. 18-2 at ¶ 1; Plaintiff's Response to Defendant's Proposed Undisputed Facts, Doc. 16-1 at ¶ 1.) Plaintiff Thomas Kelly worked for ACT as a Collections Manager from 2012 until his termination effective March 17, 2017. (Doc. 18-2 and Doc. 16-1 at ¶¶ 2 and 67.) Kelly reported to Operations Manager, Mike Havrilla, and Havrilla reported to Director of Operations, Junior Sanchez. (Doc. 18-2 and Doc. 16-1 at ¶¶ 3–4.) As part of his normal responsibilities, Kelly managed a team of hourly debt collections employees. (Doc. 18-2 and Doc. 16-1 at ¶ 8.)

Kelly first requested leave pursuant to the Family and Medical Leave Act, 29 U.S.C. §§ 2601, *et seq.* ("FMLA"), to address a skin cancer issue in 2014. (Kelly Dep., Doc. 14 at PageID

1

661–62.)  According to Kelly, Sanchez told him that he had missed too much work over the medical issue, explained that Kelly needed to be at work to get his team to goal, and advised Kelly to "think hard about [his] priorities and whether [he] was making the right decisions to help [his] career at ACT" as Sanchez "would hate to lose [him] as [he] was a good employee." (Kelly Dec., Doc. 16-3 at ¶ 7.)  Because he feared losing his job, Kelly did not complete the FMLA paperwork process or go to his remaining medical appointment.  (Doc. 14 at PageID 662.)

In May 2016, Kelly again requested FMLA leave, this time for back pain from an earlier car accident, and ACT ultimately approved use of intermittent leave consistent with his physician's recommendation.  (Holton Dec., Doc. 13-2 at PageID 307; Doc. 14 at PageID 394, 661–62.)  Sanchez and Claudia Holton, an ACT Human Resources Generalist, allegedly advised Kelly that if he "decided to use FMLA, [his] hourly pay and [his] bonuses would be prorated for every – every hour, every minute [he] took of FMLA."  (Doc. 14 at PageID 480.)  ACT lost his initial FMLA paperwork, but Kelly completed a second set and asked his physician to resubmit it.  (*Id.* at PageID 505.)  As Kelly began taking physician-recommended time off for his back pain, Havrilla tried to write him up.  Kelly protested the write up, informed Havrilla it was proper FMLA leave, and threatened to employ an attorney.  (*Id.* at PageID 505–06.)  Havrilla told him not to sign the write up and informed Kelly the next day that ACT now said it had obtained his FMLA paperwork.  (*Id.* at PageID 506.)  Around August 2016, Kelly informed Holton that he would need back surgery at some point in the future, and she sought assistance in obtaining insurance approval.  (Doc. 13-2 at PageID 324.)

In February 2017, Kelly informed Havrilla that he finally intended to get back surgery and began trying to prepare other managers to help cover his workload while he was on medical leave. (Doc. 14 at PageID 501–02.) Once Kelly informed Havrilla about the surgery, ACT "started auditing all of [his] work." (*Id.* at PageID 489.) According to Kelly, ACT then began "going back and looking at training forms, basically my daily – everything I do every day and every month. Stuff that we never – never was looked at prior to me turning in FMLA paperwork." (*Id.*) Kelly emailed Havrilla, "It also feels like since I mentioned I'd be needing surgery soon, I've been singled out for something every couple of days." (*Id.* at PageID 575.) According to Kelly, "Apparently people had been talking about me for eight months, my employees, and nothing was brought to my attention, but once FMLA paperwork was filed, then it became a problem." (*Id.* at PageID 622.)

Also in February 2017, according to Holton, "We began an investigation into Thomas Kelly."[1] (Doc. 13-2 at PageID 354.) On February 17, 2017, Holton reported to Sanchez that Kelly changed a subordinate's time cards on certain dates because her time cards did not coincide with her security badge swipes. (*Id.* at PageID 329). Sanchez immediately responded (adding Havrilla to the email), "Just like I thought and told you last night! See below, I want Written Warnings issued for Tom and Points assessed to [the subordinate] with a Written Warning for failing to follow policy!" (*Id.*) Holton then expanded the audit back to August 2016 and found multiple discrepancies between the time cards Kelly edited and the times the employee's badge swipes indicated she had worked. (*Id.* at PageID 326, 332–33.) Kelly's

---

[1] Holton does not state the reason she and Sanchez began the investigation into Kelly, but she does note that she also audited the records for Kelly's colleague, Edward Thurman, at the same time. (Doc. 13-2 at PageID 308.) The record does not indicate what, if anything, happened to Thurman as a result of his audit.

inaccurate edits to the subordinate's time cards resulted in the subordinate sometimes being overpaid, sometimes underpaid, and sometimes permitted her to avoid disciplinary "points" when she was late or missed work. (Doc. 13-2 at PageID 354.)

When asked about the time card discrepancies, Kelly insisted that he validated the time cards exactly as the ACT human resources representative instructed. (Doc. 14 at PageID 531.) ACT required him to validate the employee time cards at the end of every week. (*Id.* at PageID 528.) Because the time card system frequently malfunctioned, employee time cards were sometimes blank or missing information. (*Id.* at PageID 528–30.) When that happened, he would "click a button . . . and then when you reclick it, it will populate to what was put in Monday as the schedule." (*Id.* at PageID 537–38.)

During the first week of March 2017, Holton exchanged multiple emails with Kelly, Havrilla and Sanchez identifying time card/badge swipe discrepancies for Kelly's edits to the subordinate's time records. (Doc. 13-2 at PageID 311.) On March 3, 2017, another of Kelly's subordinates—Bill Lowe—"came to" Havrilla and Holton "with complaints about Kelly's management." (*Id.* at PageID 312.) On March 7, 2017, at Holton's request, Lowe provided a lengthy written statement about inappropriate and/or threatening comments Kelly allegedly made in the workplace, including that he told a female subordinate he had "12 inches" for her during discussions of a Valentine's Day "love box," and that he hoped Havrilla "got in a car wreck and died." (*Id.* at PageID 312.)

On March 9, 2017, Havrilla asked Kelly to meet with him, Sanchez, and Holton. (Doc. 14 at PageID 507.) At that meeting, Kelly was read a list of allegations against him, including inappropriate sexual comments to his subordinates, disparaging comments about Havrilla, and disparities between his time card validations and the employee's badge swipes. (*Id.* at PageID

4

508–12.) When Holton mentioned the time card issue, Kelly "basically explained that at that time, I did exactly what [the human resources representative] told me to do. I'd been doing it for the last six months. Nobody's ever said it was wrong. All of the sudden, it is." (*Id.* at PageID 577–78.) Kelly further stated that ACT looked only at one employee they believed he favored, but he encouraged them to look at all of his subordinates as he validated all time cards using the same method as instructed by human resources. (*Id.* at PageID 543.) Finally, Kelly stated that an employee asked him why Havrilla "wants [Kelly] gone so bad" as he "pulled [her] off the floor again to ask more questions about you . . . [and she] felt like [Havrilla] was fishing for dirt on [Kelly.]" (*Id.* at PageID 546.)

The next day—March 10, 2017—Kelly left for a prearranged vacation to Florida. (*Id.* at PageID 579.) On the day he was scheduled to return to work, Kelly received a "Notice to Employee as to Change in Relationship" via courier stating, "Involuntary Termination – Tom, your employment with ACT is ending effective today, 3/17/2017, for falsification." (Doc. 13-2 at PageID 356 (emphasis omitted).)

Kelly testified at deposition that, as a manager, he previously had been asked to help ACT do something similar to another employee. According to Kelly, Rebecca Montgomery, a former ACT employee, was diagnosed with cancer, and she told her manager she would need FMLA time to get treatment. (Doc. 14 at PageID 516, 619–20.) "[F]rom that point on there was a problem. And it was get rid of her, get rid of her, get rid of her, and she was gone." (*Id.* at PageID 619.) Shortly after Montgomery had been terminated, Sanchez pulled Kelly and another manager into his office and told them they "needed to come up with backdated notes, backdated coaching sheets, so it looked like this wasn't a first offense and we had paper trails, so that firing her would look legitimate." (*Id.* at PageID 516–17.) "[A]fter she was let go, when we were told

5

to falsify the document, that's how I know that it was based on cancer, because I was told to falsify documents." (*Id.* at PageID 620.)

### B. Procedural Posture

Kelly initiated this action alleging that ACT interfered with his rights under the Family and Medical Leave Act, 29 U.S.C. §§ 2601, *et seq.* ("FMLA"), and ultimately terminated him for taking FMLA leave. ACT now moves for summary judgment, contending that there is no causal connection between Kelly's FMLA leave and his termination and that Kelly was terminated for falsifying an employee's time records and making inappropriate comments in the workplace.

## II. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden to show that no genuine issues of material fact are in dispute. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811 (6th Cir. 2011). The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

A court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. "[F]acts must be viewed in the

light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis added); *see also E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 760 (6th Cir. 2015) (*en banc*) (quoting Scott). A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see also Shreve v. Franklin Cnty., Ohio*, 743 F.3d 126, 132 (6th Cir. 2014) ("A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party.") (emphasis in original) (citation omitted). Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

### III. ANALYSIS

The FMLA provides two distinct avenues for recovery: "the so-called 'interference' or 'entitlement' theory arising from § 2615(a)(1), and (2) the 'retaliation' or 'discrimination' theory arising from § 2615(a)(2)." *Seeger v. Cincinnati Bell Telephone Co., LLC,* 681 F.3d 274, 282 (6th Cir. 2012). In this case, Kelly claims that ACT interfered with his FMLA rights by threatening to terminate him or reduce his pay if he used FLMA leave and retaliated against him for using FMLA leave by terminating his employment.

#### A. Interference or Entitlement Claim

Pursuant to the FMLA, "It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise" the rights provided by the FMLA. 29 U.S.C. § 2615(a)(1). "Interfering with the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." 29 C.F.R. § 825.220(b). "The interference theory has its roots in the FMLA's creation

7

of substantive rights, and '[i]f an employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave, a violation has occurred,' regardless of the intent of the employer." *Seeger*, 681 F.3d at 282 (quoting *Arban v. West Publ'g Corp.*, 345 F.3d 390, 401 (6th Cir. 2003)).

However, "Employees seeking relief under the entitlement [also called the interference] theory must therefore establish that the employer's violation caused them harm." *Edgar v. JAC Prod., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006). The FMLA "provides no relief unless the employee has been prejudiced by the violation." *Id.* (quoting *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002)).

In the case at bar, Kelly testified that Sanchez threatened to terminate his employment and reduce his salary and bonuses if he took FMLA leave. (Kelly Dec., Doc. 16-3 at ¶ 7; Doc. 14 at PageID 480.) In addition, ACT "lost" his first set of FMLA paperwork, and Havrilla threatened to write him up for taking proper FMLA leave. (Doc. 14 at PageID 505–06.) However, once he resubmitted the paperwork, ACT granted him all the FMLA leave to which he was entitled for his back problems, and Havrilla rescinded the disciplinary action. (*Id.* at PageID 503, 506.) Thus, it appears that Kelly was not actually harmed by ACT's alleged attempts to interfere with Kelly's FMLA rights.

It is true that Kelly claims he did not complete the FMLA paperwork process in 2014 and skipped his skin cancer-related medical appointment due to Sanchez' threats to his job. (Doc. 14 at PageID 662.) However, Kelly's complaint raises only events in 2016 and 2017 related to Kelly's back issues (probably for statute of limitations reasons). Because the missed medical appointment and decision not to pursue FMLA leave in 2014 are outside the scope of this case, they cannot serve as the harm required for Kelly's FMLA interference claim here.

8

In addition, while termination may support an interference claim in some circumstances,[2] it does not appear that it applies here and Plaintiff has not argued that it does. (*See* Doc. 16 at PageID 690.) Accordingly, ACT is entitled to summary judgment on Kelly's interference claim.

**B. Retaliation Claim**

"When evaluating FMLA retaliation claims in the absence of direct evidence, courts employ the *McDonnell Douglas* burden-shifting framework." *Stein v. Atlas Ind., Inc.*, 730 F. App'x 313, 319 (6th Cir. 2018); *Seeger*, 681 F.3d at 283. Under this framework, Kelly must show that: (1) he exercised an FMLA-protected right; (2) ACT knew he exercised the right; (3) Kelly suffered an adverse employment action; and (4) a causal connection exists between Kelly's protected activity and the adverse employment action. *Stein*, 730 F. App'x at 318–19; *Seeger*, 681 F.3d at 283. "The burden of proof at the prima facie stage is minimal; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity." *Seeger*, 681 F.3d at 283 (quoting *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 20017)).

In the case at bar, the parties agree that Kelly exercised an FMLA-protected right; ACT knew he exercised the right; and Kelly suffered an adverse employment action. The only issue in making his prima facie case, then, is whether a causal connection exists between Kelly's protected activity and his termination.

For purposes of establishing causation, "[I]n certain distinct cases where the temporal proximity between the protected activity and the adverse employment action is acutely near in time, that close proximity is deemed indirect evidence such as to permit an inference of

---

[2] *See Seeger v. Cincinnati Bell Telephone Co., LLC*, 681 F.3d 274 (6th Cir. 2012).

retaliation to arise." *Seeger*, 681 F.3d at 283 (quoting *DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004)). "Without more, however, temporal proximity only suffices to make a plaintiff's prima facie case where the adverse employment action occurs 'very close in time after an employer learns of a protected activity.'" *Stein*, 730 F. App'x at 319 (quoting *Seeger*, 681 F.3d at 284). Once a significant period of time has elapsed, a plaintiff must present additional evidence of retaliatory motive to establish the causal connection necessary to make his prima facie case. *Id.* (affirming summary judgment for defendant where ten weeks elapsed between plaintiff's FMLA leave and termination where plaintiff presented no additional evidence of retaliation); *see also Bush v. Compass Group USA, Inc.*, 683 Fed. Appx. 440 (6th Cir. 2017) (affirming dismissal where ten weeks elapsed between FMLA notice and termination) and *Bryson v. Regis Corp.*, 498 F.3d 561 (6th Cir. 2007) (holding three-month lapse between plaintiff's FMLA leave request and termination on the day of her scheduled return established a causal connection when paired with other evidence of retaliatory motive).

In the case at bar, Kelly requested FMLA leave for back pain, and his request was approved in August 2016. (Doc. 13-2 at PageID 307.) While Claudia Holton knew in August 2016 that Kelly may eventually need back surgery—and, in fact, tried to help him obtain insurance approval—Kelly made it clear that he intended at that time to manage his back problem medically rather than taking time off for surgery. (*Id.* at PageID 324–25.) It was not until February 2017 that Kelly informed Havrilla that he finally intended to get back surgery and began trying to prepare other managers to help cover his workload while he was on medical leave. (Doc. 14 at PageID 501–02.) Once Kelly informed Havrilla about the surgery, ACT began "going back and looking at training forms, basically my daily – everything I do every day

10

and every month. Stuff that we never – never was looked at prior to me turning in FMLA paperwork." (*Id.* at PageID 489.)

Holton admits that in February 2017, ACT "began an investigation into Thomas Kelly" for unspecified reasons. (Doc. 13-2 at PageID 354.) ACT investigated and then terminated Kelly less than five weeks after he announced his intention to take FMLA leave for surgery. In this situation, temporal proximity alone may be enough to establish causation. *See Stein v. Atlas Indus., Inc.*, 730 Fed. Appx. 313 (6th Cir. 2018); *see also Seeger*, 681 F.3d 283–84 (eight-week gap between protected activity and adverse employment action sufficient to establish prima facie case). However, Kelly offered additional evidence that Sanchez previously made veiled threats to Kelly's continued employment (Doc. 16-3 at ¶ 7) and threatened to prorate his pay if he took FMLA leave (Doc. 14 at PageID 480), and others warned Kelly not to tell Sanchez he was having surgery because he would be terminated (*Id.* at PageID 622). Thus, Kelly has satisfied the minimal burden of proof necessary to establish his prima facie case.

Once a plaintiff has established a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Seeger*, 681 F.3d at 284. In the case at bar, ACT has undoubtedly articulated a legitimate, nondiscriminatory reason for Kelly's termination. ACT offers substantial evidence that Kelly failed to ensure the accuracy of a subordinate's time cards, and, in fact, Kelly admits that he used the "double click" method of substituting a subordinate's scheduled work time for missing punch ins and punch outs. ACT's official policies state, in part, "Altering, falsifying, tampering with time clock records, or recording time on another employee's time sheet is against company policy and is grounds for immediate termination." (Doc. 14-1 at PageID 677 (emphasis omitted).) In addition, Bill Lowe and other employees reported inappropriate sexual and disparaging

comments in the workplace that would also constitute a legitimate, nondiscriminatory reason for Kelly's termination. (Doc. 13-2 at ¶¶ 38, 42, 44, and 47.) Accordingly, ACT has met its burden.

If the defendant meets its burden of proof, the burden then shifts back to the plaintiff to produce evidence demonstrating that the defendant's proffered reason is a pretext for discrimination. *Seeger*, 681 F.3d at 285. "A reason cannot . . . be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." *Id.* (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)). As the Courts in this Circuit have explained:

> Unlike its role in establishing a prima facie case, "the law in this circuit is clear that temporal proximity cannot be the sole basis for finding pretext." *Donald*, 667 F.3d at 763. However, "suspicious timing is a strong indicator of pretext when accompanied by some other, independent evidence." *Bell v. Prefix, Inc.*, 321 Fed. Appx. 423, 431 (6th Cir. 2009) (citation and internal quotation marks omitted). A plaintiff may establish pretext by showing that the employer's proffered reasons (1) have no basis in fact; (2) did not actually motivate the action; or (3) were insufficient to warrant the action. *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000). "Whichever method the plaintiff employs, he always bears the burden of producing sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that the defendant [ ] intentionally discriminated against him." *Clark*, 424 Fed. Appx. at 474 (citation and internal quotation marks omitted).

*Seeger*, 681 F.3d at 285.

In the instant case, Kelly offered evidence that ACT human resources instructed him to use the "double click" method of correcting time cards with missing information, that he had been following that procedure for the many months since he had been instructed to do so, and that both his superiors and the human resources department had no problem with him using that method to reconcile missing time card information until he requested FMLA time for back surgery. (Doc. 14 at PageID 577–78, 538–41.) In addition to the suspicious timing of ACT's

12

investigation into Kelly beginning the same week Kelly informed Sanchez that he intended to take FMLA surgical leave, Bill Lowe suddenly "came to" Havrilla and Holton to complain about comments apparently made months earlier. (Doc. 13-2 at ¶ 47; Doc. 14 at PageID 622 ("Apparently people had been talking about me for eight months, my employees, and nothing was brought to my attention, but once FMLA paperwork was filed, then it became a problem.")) Also, a new associate informed Kelly during the relative time period that "Mike [Havrilla] pulled me off the floor again to ask more questions about you. When I asked what – when I asked what about, she said – she said she felt like he was fishing for dirt on me." (Doc. 14 at PageID 546.) Finally, Kelly offered evidence that Sanchez had asked him to falsify and backdate documents so that ACT could terminate a colleague who had been diagnosed with cancer before she could take FMLA leave for cancer treatment. (Doc. 14 at PageID 516–17, 619–20.) While the Court notes that ACT vehemently denies these allegations, Kelly has offered enough evidence from which a jury could reasonably reject ACT's explanation for his termination and infer that ACT intentionally discriminated against him. Accordingly, Kelly has preliminarily established pretext, and ACT's Motion for Summary Judgment on Kelly's retaliation claim must be denied.

## IV. CONCLUSION

For the foregoing reasons, ACT's Motion for Summary Judgment (Doc. 15) is **GRANTED** on Kelly's interference claim pursuant to 29 U.S.C. § 2615(a)(1) but **DENIED** on Kelly's retaliation claim pursuant to 29 U.S.C. § 2615(a)(2).

**IT IS SO ORDERED**.

Dated: 8/22/18            S/Susan J. Dlott
                                          Judge Susan J. Dlott
                                          United States District Court